**14**

UNITED STATES, Appellee,

v.

Martin T. ACOSTA, Lance Corporal,
U.S. Marine Corps, Appellant.

No. 97–0905.
Crim.App. No. 96–0429.

U.S. Court of Appeals for
the Armed Forces.

Argued March 23, 1998.

Decided Sept. 22, 1998.

For Appellant: *Lieutenant Albert L. Di Giulio*, JAGC, USNR (argued).

For Appellee: *Lieutenant Commander Christian L. Reismeier*, JAGC, USN (argued); *Colonel Charles Wm. Dorman*, USMC, and *Commander D.H. Myers*, JAGC, USN (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

During January and July of 1995, appellant was tried by a general court-martial composed of officer members at Marine Corps Base, Camp Pendleton, California. Contrary to his pleas, he was convicted of 4 specifications of wrongful distribution of methamphetamine and 2 specifications of wrongful use of methamphetamine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. He was sentenced to a dishonorable discharge, confinement for 10 years, total forfeitures, and reduction to the lowest enlisted grade. On January 23, 1996, the convening authority approved the adjudged sentence, but he suspended confinement in excess of 8 years for the period of confinement plus 12 months. He also approved total forfeitures, but only until the unsuspended confinement was terminated; thereafter, the approved forfeiture was $569.00 pay per month. The Court of Criminal Appeals affirmed the findings and sentence. 46 MJ 670 (1997).

On September 10, 1997, this Court granted review of the following issue:

WHETHER THE MILITARY JUDGE PROFOUNDLY DEPARTED FROM THE ACCEPTABLE AND USUAL COURSE OF JUDICIAL PROCEEDINGS AND MATERIALLY PREJUDICED THE SUBSTANTIAL RIGHTS OF APPELLANT BY ABANDONING HIS IMPARTIAL AND NEUTRAL ROLE.

We hold that the military judge did not abandon his impartial role during appellant's court-martial. *See United States v. Ramos*, 42 MJ 392 (1995); *see also United States v. Hill*, 45 MJ 245 (1996).

The court below summarized the facts underlying the granted issue as follows:

During the Article 32 hearing prior to this general court-martial, Private Baumert testified in passing that he had purchased cocaine before from the appellant. Concerned that this evidence of uncharged misconduct would be brought out before the members at the court-martial, the appellant's counsel filed a motion in limine, on the basis of Mil.R.Evid. 403, "to prevent the introduction of this evidence." Appellate Exhibit I at 2. During the discussion of this motion, the Government stated that it did not intend to introduce this evidence

and did not "oppose the motion as it relates to uncharged misconduct." Record at 16. The military judge observed that there were "hypothetical situations" in which the Government could appropriately use such evidence, such as to rebut "a blanket denial" by the appellant of any involvement with drugs. Record at 17. The military judge then directed the trial counsel, "if this case takes an unusual turn of events," to request an Article 39(a) session before trying to use this evidence. *Id.*

During his opening argument, the civilian defense counsel laid out his planned approach to the case. He stated that the evidence would show that his client was "not a sophisticated drug dealer." Record at 145. Instead, he merely tried to be a "life raft" for Private Baumert who had lost his normal supplier of crystal methamphetamine. *Id.* Private Baumert, in the meantime, was "desperate" to "target" someone who might sell him some drugs so that he could "save his skin" by getting the NCIS to report his cooperation to his command. *Id.* at 144. Although the defense counsel did not mention the word "entrapment" in his opening argument, this was clearly the gist of the defense's theory of the case.

Private Baumert was the first witness for the Government. He testified as to one uncontrolled buy and three controlled buys of methamphetamine he made from the appellant under NCIS auspices. He also testified as to his knowledge of the appellant's personal use of methamphetamine. Anticipating the entrapment defense, the trial counsel elicited testimony that the appellant displayed little or no reluctance in selling or using drugs on these occasions. Record at 152–61. A very extensive cross-examination followed, including many references to statements the witness had made during the Article 32 hearing. The defense counsel sought admissions that Private Baumert had been under great pressure to cooperate with the NCIS. Initially, he had identified Lance Corporal Nobbee as the individual he would target, but could not follow through because Nobbee had become an unautho-

rized absentee. As a result, Private Baumert admitted, in response to leading questions, that he had to "set someone else up" or "get somebody" to satisfy his NCIS handlers. Record at 169, 180. Although the civilian defense counsel used the word "entrapment" only once, one important thrust of the cross-examination (in addition to establishing that Private Baumert was not the most forthright and credible of witnesses) was that he, working with the NCIS, placed undue pressure on the appellant to commit a crime he would otherwise not have done.

On redirect, the trial counsel appeared concerned primarily with damage control as to his witness' credibility; he did not deal with entrapment at all. In a brief follow-up, the civilian counsel immediately sought to reemphasize his theme that the witness was under great pressure from NCIS to set up a buy. He then renewed his attack on the witness's credibility. Record at 187–88.

*The military judge next asked a series of 89 questions.* Record at 189–96. Record at 191. Although some of these were housekeeping questions or tried to clarify the witness's earlier testimony, *the focus of many of them was to nail down why the witness believed in late December 1994 that the appellant would be willing to sell him crystal methamphetamine.* Initially the witness testified that it was based only on "rumors." Record at 189. Upon further prompting by the military judge, the witness admitted that he had purchased drugs from the [appellant] "earlier," in July 1994. Record at 191. At this point the following exchange took place:

CC: *Excuse me, Your Honor, if I could. Can we have a short 39(a), sir?*

MJ: *No. Sit down, Mr. Tranberg. You raised an issue of entrapment.*

*Id.* The witness then testified that this had happened only "one previous time" between July and December 1994. *Id.* Later, when the witness attempted to provide additional details about the July transaction, the military judge stated: *"I don't want to know anything more about that. Okay?"* Record at 192. However, the mili-

tary judge continued to interrogate the witness, making clear that the appellant had sold methamphetamine to the witness in December 1994 a month or so before he had become involved with the NCIS. Record at 192–93. Although this sale and the associated use was charged misconduct and the trial counsel had established this sequence of events when he first questioned the witness, he had not emphasized it on redirect. *See* Record at 147–50. After the questioning by the military judge, however, and assuming they believed the witness, no reasonable member of the panel could have had any question but that the appellant was predisposed to distribute illegal drugs.

After both counsel had full opportunity to inquire of this witness, the military judge provided an instruction to the members as to the defense of entrapment. *He also provided a very strict limiting instruction with respect to the testimony concerning the July 1994 transaction.* Record at 198–99. The members posed no additional questions. The defense never objected to any of the military judge's questions or to his instructions.

46 MJ at 672–74 (footnotes omitted; emphasis added).

The appellate court below found that the military judge erred in questioning the prosecution's chief witness about appellant's prior, uncharged "July 1994 drug transaction and several other adverse pieces of evidence." It also held that "the military judge committed additional error when he refused the civilian defense counsel's request for an Article 39(a) session." *Id.* at 675. Nevertheless, it concluded that the entire record raised little doubt concerning the trial judge's impartiality, or his appearance of impartiality; nor was appellant prejudiced by the above errors. *Id.* at 676. Appellant, before this Court, argues that the military judge's erroneous conduct constituted reversible error because it created a reasonable doubt as to the fairness of the proceedings against him.

■ The first question we will address in this case is whether the Court of Criminal Appeals was correct in concluding that the military judge erred in questioning the Government's principal witness about a prior, uncharged drug distribution from appellant in July of 1994. The appellate court below acknowledged that this testimony was admissible as rebuttal evidence once defense counsel raised the defense of entrapment as to the December 1994 and January 1995 drug distribution charges. *Id.* at 674. It held, however, that it was error for the military judge, rather than the trial counsel, to elicit this testimony, which effectively devastated appellant's defense of entrapment. Such questioning, it asserted, "appeared to help the prosecution undermine the defense strategy" and "crossed the line of acceptable judicial interrogation." *Id.* at 675. We disagree.

■ Article 46, UCMJ, 10 USC § 846, and Mil.R.Evid. 614, Manual for Courts–Martial, United States (1995 ed.), provide wide latitude to a military judge to ask questions of witnesses called by the parties. *See generally Ramos*, 42 MJ at 396. In this regard, we note that Article 46 provides that a court-martial shall have "equal opportunity" with trial counsel and defense counsel "to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." Furthermore, Mil.R.Evid. 614 provides no limitation on the number or type of questions that a military judge may ask, although such questions may be objected to on legal grounds by either of the parties. For example, such questioning cannot be conducted in a manner which causes the military judge or members to become partisan or appear partisan in the case before them. *See United States v. Ramos, supra; United States v. Dock,* 40 MJ 112, 128 (CMA 1994); *see also Hill,* 45 MJ at 248.

■ Turning to the opinion of the appellate court below, it initially suggests that the military judge's questions were improper because he knowingly elicited answers to questions which favored the prosecution and which eviscerated appellant's defense of entrapment. Neither Article 46 nor Mil.

R.Evid. 614 precludes a military judge from asking questions to which he may know the witness' answer; nor do they restrict him from asking questions which might adversely affect one party or another. Moreover, our case law has not gone that far. *See Dock, supra* at 128 (far better for military judge to abstain from asking questions whose answers he knows will favor prosecution). In addition, *United States v. Moorehead,* 57 F.3d 875, 878–79 (9th Cir.1995), the civilian case heavily relied on by the court below for its finding of error in such questioning, is inapposite. There, the prior, uncharged drug-conduct evidence adduced by the judge, which devastated the defense case, was otherwise irrelevant. Here, the judge-adduced evidence was materially relevant to a critical issue in this case, *i.e.,* appellant's defense of entrapment. Finally, in view of the military judge's own previous order excluding this evidence on a conditional basis at the request of the defense, immediate corrective action on his part was clearly warranted to respond to the change in circumstances wrought by the defense. *See* RCM 801(e)(1)(B), Manual, *supra* (recognizes military judge's power to change ruling "at any time during the trial").

■■■ Turning to the Court of Criminal Appeals' appearance-of-partisanship rationale, we also find it unpersuasive. Judge Wiss, writing for this Court in *Ramos, supra* at 396, articulated the appropriate standard of review:

> Thus, while a military judge must maintain his fulcrum position of impartiality, the judge can and sometimes must ask questions in order to clear up uncertainties in the evidence or to develop the facts further. *See United States v. Dock, supra; United States v. Tolppa,* 25 MJ 352 (CMA 1987); *United States v. Reynolds,* 24 MJ 261 (CMA 1987).
>
> The legal test that flows from all this is whether, "taken as a whole in the context of this trial," a court-martial's "legality, fairness, and impartiality" were put into doubt by the military judge's questions. *United States v. Reynolds, supra* at 265. This test is applied from the viewpoint of the reasonable person. S. Childress & M.

Davis *2 Federal Standards of Review* § 12.05 at 12–38 (2d ed.1992).

We conclude for several reasons that a reasonable person, viewing the questions of the judge in proper context, would not have doubt about the impartiality of this judge. First, neither appellant nor defense counsel subsequently objected to the judge's continued sitting in this case. *See* RCM 902(a) and (d); *see generally Hill, supra* at 249 (failure to object shows defense belief in neutrality). Moreover, 79 of the 89 questions asked by the military judge concerned matters previously covered by both trial counsel and defense counsel in their examination of this witness and did not suggest any judicial preference or belief. *See United States v. Hobbs,* 8 MJ 71, 73 (CMA 1979); *see also United States v. Norris,* 873 F.2d 1519, 1526 (D.C.Cir.1989); *United States v. Tilghman,* 134 F.3d 414, 417 (D.C.Cir.1998). Furthermore, the remaining 10 questions were directly related to an evidentiary matter which the military judge subsequently gave extensive and repeated instructions concerning its proper and improper use. (*See* Appendix.) Finally, the military judge instructed the members on their sole responsibility to determine facts, but also to "disregard any comment or statement made by me [the military judge] during the course of this trial that may seem to indicate to you an opinion on my part as to whether the accused is guilty or not guilty. . . ." *Cf. United States v. Filani,* 74 F.3d 378, 386 (2d Cir.1996)(curative instruction that jury is sole judge of credibility not sufficient).

■■ A second question before us is whether it was error for the trial judge to summarily deny the defense an Article 39(a) session to discuss admissibility of this uncharged misconduct. On first look, such a curt response by the judge, which cut off defense counsel, seems one-sided, especially in light of the military judge's prior ruling suggesting the prosecution could request such a session to introduce this evidence. *See generally Filani, supra* at 385 ("It is no grace to a judge . . . to show quickness of conceit in cutting off evidence or counsel too short. . . . Francis Bacon, Essays, *Of Judi-*

*cature.* ...."). However, closer examination of the entire record of trial leaves a less partial impression of this discretionary decision by the trial judge. *See United States v. Laurins,* 857 F.2d 529, 538 (9th Cir.1988) (decision to hold side-bar conference a discretionary matter for trial judge).

■ Here, the question of the admissibility of the uncharged misconduct, to a large extent, had been previously discussed by the parties and their respective positions made known to the military judge at an Article 39 session. Moreover, given the defense cross-examination of Private Baumert, which laid an evidentiary foundation for a defense of entrapment, there was no possibility that the military judge would have ruled in favor of the defense had he held an Article 39(a) session prior to asking the question at issue. *See United States v. Pisani,* 773 F.2d 397, 403–04 (2d Cir.1985). Also, the evidence of a prior incident of drug distribution by appellant to the government witness was plainly admissible under Mil.R.Evid. 404 to show why the government witness approached appellant to buy drugs and to rebut any suggestion that appellant was entrapped by that same government witness. *See United States v. Hunter,* 21 MJ 240 (CMA 1986). Finally, admission of this evidence for a specific, non-character purpose, coupled with a strict limiting instruction by the trial judge, fully responded to appellant's previously stated concern with the possible misuse of this evidence by the members in violation of Mil. R.Evid. 403. *See Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Thus, the judge's summary action, although abrupt, constituted an authorized rejection of defense counsel's legal argument. *See United States v. Edmond,* 52 F.3d 1080, 1100 (D.C.Cir.1995).

In sum, we do not agree with the appellate court below that the military judge erred in his questioning of the Government's principal witness and in his summary rejection of defense counsel's request for an Article 39(a) session. However, we do share its general concern for appearances of fairness at court-martial and judicial impartiality. Nevertheless, we reject appellant's argument that this military judge was unfair in fact or appearance and join the service appellate court in affirming these convictions.

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges CRAWFORD, GIERKE, and EFFRON concur.

---

### APPENDIX

MJ: Captain Glazier?

TC: Nothing further, Your Honor:

MJ: Members of the Court, before we proceed any further I'd like to give you some guidance about some evidence that you've just heard. In order to do this, however, I need to make sure you understand what the defense of entrapment is about and entrapment is a defense when the government agents or people cooperating with them such as Lance Corporal Baumert here cause an innocent person to commit a crime which otherwise would not have occurred. The accused cannot be convicted of an offense if he was entrapped.

Now an innocent person is one who is not predisposed or inclined to readily accept the opportunity furnished by someone else to commit the offense charged. It means that the accused must have committed the offense charged only because of the inducements, enticements or urgings of representatives of the government. For this purpose, Private Baumert is clearly a government agent for the purpose of these alleged buys that he's testified about.

You should carefully note that if a person has a predisposition, inclination or intent to commit an offense or is already involved in unlawful activity in which the government is trying to uncover, the fact that the agent provides opportunities, facilities or assists in the commission does not amount to entrapment.

Now, the defense of entrapment exists if the original suggestion and initiative to commit the offense originated with the

government, not the accused, and the accused was not predisposed or inclined to commit the offense. In this case it would be the distribution of methamphetamine. The focus in an entrapment case in which you clearly do have government inducement or activity at least to some point is the latent predisposition of the accused which may be triggered by the government inducement.

So with that in mind, I mean, with some sense of what the defense of entrapment is all about, I want to touch on the evidence that came out, you know, certainly to my surprise that in July after a deployment the accused may have sold an illegal drug to Private Baumert here and this is important, gentlemen. You may consider this evidence but you may only consider it for a limited purpose and that would be its limited purpose to rebut any contention from the defense that his subsequent distributions of methamphetamine was a result of entrapment by the government.

In other words, this evidence, if you believe it at all, tends to show a predisposition and has a tendency to do away with defense of entrapment and that's it only purpose or function that you may consider it or it should be considered in trial because this offense has not been charged by the government.

Now, you may consider this evidence, once again, only to limit any defense—excuse me. Only for the limited purpose of considering any defense entrapment and you may not conclude from this evidence, and again that's the earlier July transaction that this witness testified about, that the accused is a bad person or has criminal tendencies and he, therefore, committed the charged offenses.

The reason that we need to be so careful about this is—I can't stress this enough—is the accused is on trial only for the offenses that the government has charged him for. The government has not charged him with any offense back in July. But as it does happen to the extent that entrapment is an issue that evidence of the July transaction may be considered again for the limited purpose to, in this particular case, for its tendency to rebut the defense of entrapment.

Now, do all the members understand that? If so, please raise your hand.

And will any member have any difficulty following that instruction?